**Jose OZUNA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 55448.**

Court of Criminal Appeals of Texas,
Panel No. 1.

April 4, 1979.

Rehearing En Banc Denied Oct. 17, 1979.

J. A. Canales, G. Rudolph Garza, Jr., Corpus Christi, on appeal only, for appellant.

Robert Huttash, State's Atty., Austin, for the State.

Before ONION, P. J., and ROBERTS and W. C. DAVIS, JJ.

OPINION

ROBERTS, Judge.

This is an appeal from a conviction for possession of marihuana. Upon his plea of not guilty, appellant was convicted by the court who assessed punishment at six years' confinement.

Appellant contends that the court erred in overruling his motion to suppress certain evidence which he alleges was obtained as a result of an unlawful search and seizure. We agree and reverse the judgment of conviction.

On January 6, 1976, at approximately 12:45 a. m., Jourdanton police officers Bradshaw and Soward were monitoring citizen's band radio channel 19 as they were parked in their patrol car on State Highway 16 which runs through the city. The officers heard a voice on the radio exclaim "Look out, look out, there is smoke." They. then observed a 1974 green Pontiac approaching from the rear. Almost immediately thereafter the officers heard a voice on the radio for the second time[1] instructing a red Ford to "Cut off at the red light." Bradshaw signaled the green Pontiac over to the side of the road and observed that it was equipped with a citizen's band radio. The driver of the vehicle, Garza, was permitted to proceed after the officers warned him about a vehicle equipment violation. The officers then began to patrol the immediate area in an effort to find the red Ford that was previously instructed by the unknown voice on the radio to "Cut off at the red light."

After patrolling the area for several minutes, the officers observed near State Highway 16 a red and white 1970 Ford automobile driven by the appellant. The officers stopped the vehicle and observed that it too was equipped with a citizen's band radio. As the officers were questioning the appellant outside his vehicle, Bradshaw detected the odor of marihuana. A search of the vehicle's trunk yielded approximately 285 pounds of marihuana.

Bradshaw testified that the particular citizen's band radio he was monitoring could receive radio signals within a radius of several miles and that under certain atmospheric conditions a radio signal could "skip" and thus be transmitted greater distances. Bradshaw also testified that he was unable to determine the identity and exact location of either the sender or receiver of the radio messages in question. Bradshaw further testified on cross-examination as follows:

"Q Why were you looking for the red Ford?

"A Because as to the fact of why he was diverted around us.

"Q Okay. And, this curiosity was the only reason you were looking for him?

"A Yes, sir.

"Q And at the time that you heard that there was, you heard or your partner told you, about a transmission to turn off at the red light.

"A Yes, sir.

"Q At that time, had you decided already that you were going to find that Ford?

"A Well, we were going to look for it. There is no definite saying, 'I am going to find it.'

"Q Okay.

"A But, my partner told me, he said, 'He told him to turn off at the red light, that he was getting stopped.'

"Q Okay.

"A You know, I was curious as to the fact why anybody would have somebody else turn off if they had nothing to hide.

"Q Okay. So, at that particular time had you made up your mind to stop the vehicle, the red Ford, whenever you saw it?

"A Yes sir. I told my partner, 'Well, let's see if we can find the red Ford and see why he turned off.'

"Q You were going to stop the vehicle and question him about that?

"A Yes sir.

* * * * * *

"Q Okay. Well, at the time that you stopped Mr. Ozuna, he showed you a valid driver's license. At that time was Mr. Ozuna free to travel on?

"A No sir. He was going to be detained.

"Q And why was he going to be detained at that particular moment?

1. The evidence does not show that this was the same voice that the officers had previously heard.

"A    Well, just like I say, I was curious as to the fact of why he was diverted around us.

"Q    But you, at that time, you were not sure whether this was the same person that Mr. Garza or who ever that transmission was related to, were you? You suspected him.

"A    In my own mind?

"Q    Yes sir.

"A    In my own mind there was no doubt.

"Q    But there was no way that you could tell that that particular transmission came from this particular car.

"A    No sir, I can't prove who was holding each radio.

                *    *    *    *    *    *

"Q    When you asked Mr. Ozuna to step out of his vehicle, at that time he had committed no traffic violation that you know of.

"A    No sir.

"Q    And you were just kind of curious to find out what was going on.

"A    Yes sir."

It is well settled that a temporary detention must be based on specific, articulable facts which, taken together with the rational inferences from those facts, reasonably warrant further detention of the individual while more information is obtained; the inarticulate hunch, suspicion or good faith of a police officer will not warrant such a temporary detention. *Faulk v. State*, 574 S.W.2d 764 (Tex.Cr.App.1978); *Cortinas v. State*, 571 S.W.2d 932 (Tex.Cr.App.1978). In *Faulk v. State,* supra, we quoted with approval the following language of *Armstrong v. State,* 550 S.W.2d 25 (Tex.Cr.App. 1977):

"    .    .    While a temporary investigative detention is allowed under certain circumstances, these circumstances must be such as to distinguish the activity of the detained person from that of any other citizen and must be based on an objective perception of events rather than the subjective feelings of the detaining officer.    .    .    .    There must be reasonable suspicion by the law enforcement officer that some activity out of the ordinary is or had occurred, some suggestion to connect the detained person with the unusual activity, and some indication that the activity is related to crime. [Citations omitted.] Where the events are as consistent with innocent activity as with criminal activity, a detention based on those events is unlawful."

In the present case, it was not established that the appellant was either the sending or receiving party of the radio messages which aroused the curiosity of the officers and caused them to temporarily detain the appellant for investigation. Even if we could attribute the radio messages to the appellant or Garza as appellant's accomplice, we do not regard these utterances ("Look out, there is smoke" and "Cut off at the red light"), standing alone, as facts sufficient to make reasonable the investigative stop of the appellant. These events are as consistent with innocent activity as with criminal activity, and therefore will not justify an investigative stop. *Faulk v. State,* supra; *Cortinas v. State,* supra.

Moreover, Bradshaw himself testified that the only reason he stopped the appellant for investigation was to satisfy his curiosity as to why the appellant was instructed to "Cut off at the red light." Thus, Bradshaw was unable to point to specific articulable facts which, taken together with the rational inferences therefrom, would reasonably warrant him in detaining the appellant for investigation. *Cortinas v. State,* supra. We conclude, therefore, that appellant's initial detention was based on mere suspicion and that the court erred by failing to grant appellant's motion to suppress the evidence seized as a result of this unlawful investigative stop.

The judgment is reversed and remanded.

Before the court en banc.

ON MOTION FOR REHEARING

DOUGLAS, Judge, dissenting.

The Court denies leave to file a motion for rehearing without written opinion.

The Honorable Robert Huttash, State Prosecuting Attorney before this Court, has filed for leave to file his motion for rehearing. The well written motion is adopted as the dissenting opinion. It is as follows: "TO THE HONORABLE COURT OF CRIMINAL APPEALS:

*"Issues*

"What is involved in this case is a temporary, investigative stop and the detention of the driver (appellant) because of suspicious activity based on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.' *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1888, 20 L.Ed.2d 889 (1968). The acts of the officers in this case must be judged by this Court against an objective standard: 'Would the facts available to the officer[s] at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?' *Terry v. Ohio*, 392 U.S. at 21–22, 88 S.Ct. 1880.

"It is the State's contention that the stopping of appellant's car for investigative purposes was appropriate under *Terry* standards. Thereafter, the odor of marihuana emanating from the truck of the car gave the officers independent probable cause to search it; and, upon finding the marihuana, the officers had probable cause to made a custodial arrest of appellant.

"In holding that the seizure of the marihuana was unlawful, the panel opinion appears to state the facts most favorable to appellant, not the facts most favorable to the trial court's ruling on the motion to suppress. Moreover, although the panel opinion states *Terry* standards, it fails to apply them to the facts. At one place the opinion states: ' . . . we do not regard these utterances ("Look out, there is smoke" and "Cut off at the red light"),

standing alone, as *sufficient probable cause* justifying an investigative stop of appellant.' (emphasis added) First, 'these utterances' do not stand alone, as there are additional facts that need to be stated. Second, as *Terry* makes clear, probable cause is *not* essential to an investigative stop. Therefore, the opinion's conclusion that the initial detention 'was not based on sufficient probable cause' is incorrect.

*"Evidence*

"State Highway 16 runs north and south through Jourdanton (R.48). It runs from near the Mexican border north to San Antonio and is 'one of the main routes from the north to the border of Mexico' (R.49). At Jourdanton it intersects with State Highway 97, an east-west road (R.48–49). Both are main highways for transporting illicit drugs (R.50–51) and, perhaps, 'wetbacks' (R.162–163).[1] Thus, a rational inference may be drawn from these specific and articulable facts that the officers, in addition to other police duties, were not unaware of trafficking in drugs and smuggling of 'wetbacks' in the area.

"At around 12:45 a. m. on January 16, 1976 (R.52), Officers Bradshaw and Soward[2] were parked in their marked police car (R.110) 'just south of the Wagon Wheel[3] on Highway 16 facing north' (R.52) and approximately 0.5 miles south of the intersection with Highway 97 (R.103). They listened not only to their police radio, but also had a Citizens' Band radio with which they monitored transmissions on Channel 19 (R.53). This channel is usually used by the motoring public to check on police activity or what in C. B. lingo is referred to as 'Smokey reports' (R.53–55, 90–91), in order to avoid being caught for speeding (R.53–55, 90–91). However, as may be seen by the facts of this case, the C. B. can also be used for illicit drug traffickers in order to attempt to avoid detection.

"1. Officer Soward testified that, prior to co-defendant Garza's arrest, he had 'picked up some Wets that night' (R.163).

"2. Officer Soward was a carpenter's helper who served as a reserve officer (R.144, 155). The Jourdanton police force only consisted of the Chief of Police, Officer Bradshaw, and four reserve officers (R.48, 87).

"3. Their purpose was to watch the parking lot of the Wagon Wheel as there had been 'a high ratio of thefts and vandalism there. . . . .' (R.107).

"On the night in question the range of the officers' C. B. was 'around a mile or a mile and a half' (R.135).[4] As they sat in their car they heard someone transmit, 'Look out, look out, there is smoke' (R.55–56),[5] which Officer Bradshaw described as a 'little off' because 'it was a different terminology' (R.55), apparently because not ordinarily used in typical speeding situations (R.53–55, 99–100). The officers 'turned around and looked behind' and observed 'a set of headlights coming up on us' with a defective right front headlight (R.52). This automobile, a 1974 green Grand Prix Pontiac, passed them and the officers pursued (R.57). Both cars stopped at the intersection with Highway 97, which had a 4–way stop sign and a flashing red light four ways' (R.57, 102). Officer Bradshaw flagged the Grand Prix down several blocks north of the intersection. At this time Officer Soward heard the following C. B. transmission: 'Grand Prix to red Ford, cut off at the red light, cut off at the red light. There is too much smoke, I am getting stopped' (R.145–146).

"As Bradshaw approached the Grand Prix he observed 'a citizens band radio mounted on the left hand side of the steering column which was turned on and on Channel 19, and he [co-defendant Garza] had a microphone laying on his left thigh and as I was talking to Mr. Garza there was a voice that came over the radio and he reached down and turned it off before it said anything that [Bradshaw] could understand' (R.58).

"As Soward related to Bradshaw the transmission concerning the red Ford turning off at the red light, a set of headlights was observed coming up Highway 16 to the intersection of Highway 97 northbound (R.58). The headlights then turned right on Highway 97 going east (R.58). After checking Garza's driver's license and warning him of the defective headlight, Bradshaw released Garza (R.58–59),[6] and he headed north (R.65).

"The officers then decided to try to find the car that had turned east at the intersection (R.59–60). Shortly, they heard more C. B. transmissions. 'One voice was saying, "Hey, Grand Prix, hey, Grand Prix," and this was coming in at a very close range, the needle indicating all the way into the red again. And then, in a distance, you could hear, "Hey, red Ford, hey, red Ford," and which it was coming in very weak' (R.60). As the officers got back to Highway 16 they observed tail lights, but this turned out to be the car of Rusty Ashby a dispatcher with the sheriff's office (R.60–61). The officers then observed a 1970 white over red Ford come from the east on a side street and turn to the right on Highway 16 northbound (R.61–62). This vehicle was not local, but 'the registration on it was from down in the Valley' (R.61). It also had a citizens' band radio antennae mounted on the trunk (R.62). The officers stopped the Ford several blocks north of the 16–97 intersection at approximately '12:55' (R.64).[7] As Bradshaw approached the car he observed 'a citizens' band radio mounted

"4. The opinion, page 2, mentions that Bradshaw's radio *could* receive signals within a radius of several miles and that under certain atmospheric conditions a radio signal could 'skip' and thus be transmitted greater distances. This statement, however, merely describes the radio's potential. Bradshaw testified that on the night in question he had the radio 'squelched down' and that the range was one to one and a half miles.

"5. Bradshaw described the transmission as 'coming from close range because the reading needle on the radio indicated it was a strong signal, it jumped all the way in the red area whereas on a weak signal if it's squelched down it won't hardly move . . . ..' (R.52).

"6. Bradshaw testified that Garza 'was very nervous, extremely nervous. Some people are nervous when they're talked to about a traffic violation, but he was very, very nervous for just a mere headlight violation . . . ..' (R.59).

"7. The time lapse was described as '5 to 7 minutes at most' (R.64). Moreover, the traffic in Jourdanton at that time of night was extremely light (R.64). Bradshaw testified that, from the time Garza's car was stopped until appellant's car was stopped, the only other vehicle they saw was the green Ford belonging to Ashby (R.64). No other red Ford was seen (R.64). Only appellant's vehicle fit the description of the red Ford mentioned in the C. B. transmissions (R.64). Moreover, Jourdanton is a small town, described as having a population of 1800 to 1900 people (R.86).

on the right hand side of the steering column, which was on, and on Channel 19; and he also had the microphone laying on his right thigh' (R.65). After conversation began between Bradshaw and appellant, appellant turned the C. B. off (R.65).[8]

"The officers then checked appellant's driver's license and asked him to step to the rear of the car and asked him 'why he was diverted around us, and the only answer we got was, he didn't understand English' (R.66–67). It was at this point the officers detected the smell of marihuana (R.67), opened the trunk (R.67–68), found what, in their experience, they believed to be marihuana (R.68), and made a custodial arrest of appellant (R.68).

*"Argument*

"The opinion emphasizes that the transmissions over the C. B. that night were 'unknown voices'; that Bradshaw was unable to determine 'the identity and exact location of either sender or receiver'; and he couldn't 'prove who was holding each radio.' But, this is immaterial. Bradshaw was not required to have proof beyond a reasonable doubt as to who made the transmissions. All Bradshaw needed were 'specific, articulable facts, which in light of his experience and general knowledge, together with rational inferences from those facts, would reasonably warrant intrusions on the freedom of the citizen stopped for further investigation.' *Brem v. State*, 471 [571] S.W.2d 314 (Tex.Cr.App.1978).

"Here, Bradshaw is parked on the side of a main highway from the Mexican border. He knows that illicit drugs have been trafficked on that route. He hears 'strong' C. B. transmissions over Channel 19, which to his mind is not the ordinary 'Smokey report.' That report—'Look out, look out, there is smoke'—is immediately followed by approaching northbound headlights. This car, a Grand Prix with a defective headlight, is equipped with a C. B. radio. As the car is stopped for the equipment violation,

another transmission is heard—'Grand Prix, to red Ford, cut off at the red light. There is too much smoke, I am getting stopped.' Bradshaw approaches the Grand Prix and observes that the C. B. radio is on and tuned in on Channel 19. Bradshaw then immediately sees headlights northbound on 16 make an eastbound turn on 97.

"Given the above facts, any reasonable person would conclude that the transmissions came from the Grand Prix which Bradshaw stopped. The traffic was light in this small town at that late hour. It is clear that the Grand Prix had warned a red Ford of police and told the driver to avoid them.

"Generally speaking, honest people do not try to avoid the police. Based on what Bradshaw knew, he could, and did, reasonably conclude that illegal activity was afoot. Surely, he was under a duty to see what was going on—find the red Ford. The only car he found which fit the description was appellant's. He had a duty to temporarily stop that car to investigate. Upon doing so, he smelled marihuana and obtained probable cause to search the trunk; the trunk contained marihuana. This was a legal search after a temporary investigative stop as contemplated by *Terry*.

"The State's motion for rehearing should be granted and the conviction affirmed.

"Respectfully submitted,

/s/ Robert Huttash
"ROBERT A HUTTASH
State Prosecuting Attorney"

DALLY and W. C. DAVIS, JJ., join in this dissent.

---

"8.  Soward testified that appellant 'seemed like he was very nervous' (R.147).